# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION

| | | |
|---|---|---|
| STEELCRAFT MANUFACTURING, a division of Allegion plc | : | Case No. 1:18-cv-45 |
| | : | |
| | : | Judge Timothy S. Black |
| Plaintiff, | : | |
| | : | |
| vs. | : | |
| | : | |
| UNITED STEELWORKERS AFL-CIO (LOCAL 7697), | : | |
| | : | |
| | : | |
| Defendant. | : | |

### ORDER RESOLVING THE PARTIES' CROSS-MOTIONS
### FOR SUMMARY JUDGMENT (Docs. 12, 13)

This civil action is before the Court on the parties' cross-motions for summary judgment (Docs. 12, 13) and the parties' responsive memoranda (Docs. 14, 15, 16, 17).

### I. BACKGROUND[1]

Plaintiff Steelcraft Manufacturing, a division of Allegion plc (the "Company") is a steel manufacturing company located in Blue Ash, Ohio. (Doc. 1 at ¶ 2). Defendant United Steelworkers AFL-CIO (Local 7697) (the "Union") is a labor organization as defined in 29 U.S.C. § 185. (*Id.* at ¶ 3). In this case, the Company and the Union dispute

---

[1] The parties submitted competing summary judgment records to the Court in connection with their cross-motions. The Court adopts the proposed record submitted by the Company. That record includes: (1) the arbitration transcript/exhibits; (2) the parties' post-hearing briefs; (3) the arbitrator's October 27, 2017 decision; (4) the Company's request for reconsideration; and (5) the arbitrator's denial of the Company's request. (Docs. 10-1, 10-2, 10-3, 10-4). The Court finds the categories of documents in the Company's proposed record consist with the records previously used in cases before this Court. *See Schlage Lock Company LLC v. United Steelworkers AFL-CIO (Local No. 7697)*, No. 1:14-cv-82 (record contained the same categories of documents as proposed by the Company in this matter). The undisputed facts set forth in the following section are drawn from the proposed record submitted by the Company.

whether an arbitrator's award, reinstating an employee fired after testing positive for illegal drug use, violated either their collective bargaining agreement or well-established public policy. (*See generally id.*).

The Company and the Union are parties to a collective bargaining agreement (the "CBA"). (Doc. 10-1 at 235). Among other things, the CBA governs the discipline and discharge of employees. (*Id.* at 280). The CBA provides that the Company can discipline and discharge an employee for "proper cause" ("Article 14"). (*Id.*) The Company and the Union must resolve any disputes regarding the application of the CBA through binding arbitration. (*Id.* at 274–77). During arbitration, the arbitrator cannot "add to, subtract from or modify any of the terms of th[e] [CBA]." (*Id.* at 277).

The CBA also contains a substance abuse policy ("Article 25"). (*Id.* at 292–97). Article 25 governs the Company's ability to subject its employees to drug tests. (*Id.* at 293–95). The Company is not allowed to subject its employees to "drug testing on a random basis." (*Id.* at 295). But drug testing is required after an accident that results in either "physical injury or property damage." (*Id.* at 293). Article 25 sets forth the consequence of a positive test. (*Id.* at 294). It provides that "a confirmed positive test will result in discharge." (*Id.*)

### A. The Accident and Subsequent Testing

On April 28, 2016, the Company's drug testing rules were triggered by a workplace accident. (Doc. 10-3 at 1). That day, William Warren (the "Grievant"), a Company employee and Union member, was using a forklift to move a wooden pallet. (*Id.*) The wooden pallet was stacked with steel door heads (the "parts") weighing about

2

675 pounds (collectively). (*Id.* at 1–2). While the Grievant was operating the forklift, the parts stacked on the pallet fell to the ground. (*Id.* at 2). It is not clear whether the parts fell to the ground due to an error by the Grievant, or by a combination of factors. (*Id.*)

After the accident, the Grievant and two coworkers picked up the parts and re-stacked them on another wooden pallet. (*Id.*) Neither the Grievant nor his co-workers saw any damage to the parts. (*Id.*) However, after the parts were re-stacked, the supervisor on duty, Rob Knob, told the Grievant to go to the nurse's office for drug testing. (*Id.*) The Grievant's co-workers protested that drug testing was not permitted as the accident had not resulted in property damage. (*Id.*) But Mr. Knob insisted that testing should occur, and the Grievant eventually acquiesced to testing. (*Id.*)

There is no evidence that the Company's quality control department found any evidence of property damage after the Grievant submitted to testing. (*Id.*) Nevertheless, the Company allowed the Grievant's sample to be analyzed. (*Id.*) On May 2, 2016, the Grievant's test results came back positive for Marijuana use. (*Id.*) The next day, the Grievant received a letter from the Company terminating his employment. (*Id.* at 3). The letter stated that due to the positive results of the Grievant's April 28, 2016 drug test, the Grievant's employment was terminated pursuant to Article 25. (*Id.*)

Post-termination, the Union filed a grievance with the Company, alleging that the Grievant had been unjustly terminated. (*Id.*) As required by the CBA, the Company and the Union selected an arbitrator to hear the grievance (the "Arbitrator"). (*Id.*) Then, the Company and the Union agreed that the Arbitrator would resolve the grievance by answering three issues: (1) Did Article 25 give the Company the right to drug test the

3

Grievant? (2) Was the Grievant discharged from the Company for "just cause"? And, (3) If the Company did <u>not</u> have just cause for discharge, what was the remedy? (*Id.* at 3–4).

### B. The Arbitration and Award

On October 27, 2017, the Arbitrator issued a 15-page decision, sustaining the Union's grievance. (*Id.*) The Arbitrator began his analysis by setting out the background facts giving rise to the grievance. (*Id.* at 1–3). Then, the Arbitrator set out the provisions applicable to the parties' dispute. (*Id.* at 4–5). Specifically, the Arbitrator quoted the CBA's drug testing provision (Article 25), the CBA's "just cause" provision (Article 14),[2] and the CBA provisions appliable to arbitration review. (*Id.*) Thereafter, the Arbitrator analyzed each of the issues submitted by the parties in turn. (*Id.* at 10–14).

On the first issue, the Arbitrator concluded that the Company had not technically violated the CBA by requiring the Grievant to submit to drug testing under Article 25. (*Id.* at 10–13). The Arbitrator noted that Article 25 required drug testing after accidents resulting in either "physical injury or property damage." (*Id.* at 11). And the Arbitrator found that, at the time of the Grievant's accident, there was a "good faith belief" that property damage had occurred. (*Id.* at 13). Under such circumstances, the Arbitrator

---

[2] As stated *supra*, Article 14 actually uses the words "proper cause" rather than "just cause." However, as numerous courts have noted, the terms "proper cause" and "just cause" have the same meaning. *See, e.g.*, *Horton Automatics v. Indus. Div. of Commc'ns Workers of Am.*, 506 F. App'x 253, 256 n.3 (5th Cir. 2013) ("[I]t is common to include the right to suspend and discharge for 'just cause,' 'justifiable cause,' 'proper cause,' 'obvious cause,' or quite commonly simply 'for cause.' There is no significant difference between these terms." (citation omitted)); *N. Philadelphia Health Sys. v. Dist. 1199C*, No. 2:02-MC-194, 2002 WL 32341951, at *3 (E.D. Pa. Oct. 24, 2002) ("The collective bargaining agreement between Suburban and the union permitted the company to discipline or discharge an employee for 'proper cause,' which the court recognized was synonymous with 'just cause.'"). Given the equivalence of these terms, the Court uses the terms "just cause" and "proper cause" interchangeably in this Order.

4

determined that the Company was "justified" when it required the Grievant to submit to drug testing as an initial matter following the accident. (*Id.*) In other words, the drug testing was not a random test, which would have been in violation of the CBA. (*Id.*; Doc. 10-1 at 295 ("[Article 25] does not authorize the use drug testing on a random basis")).

Turning to the second issue, although the Company could require the Grievant to submit to drug testing, the Arbitrator concluded that the Company could not terminate the Grievant with "just cause." (*Id.* at 13–14). The Arbitrator noted that just cause provisions (such as Article 14) ensure that employees receive "industrial due process" pre-termination. (*See id.*). The Arbitrator explained that the hallmarks of industrial due process include "conduct[ing] a meaningful investigation," review[ing] all "facts and circumstances," and considering the "aggravating and mitigating factors." (*Id.* at 13).

The Arbitrator found that, instead of affording the Grievant industrial due process, the Company "immediately terminated the Grievant's employment based solely on the results of the drug test." (*Id.* at 14). The Arbitrator noted that the Company:

> [D]ischarge[d] the Grievant without considering whether the results of the drug test should be disregarded due to the absence of any property damage. At the time of his discharge, the Employer had no basis to conclude that the Grievant had been in an accident that resulted in property damage. . . . Thus, the Employer had no right to use the test result as a basis for Grievant's discharge.

(*Id.*) For those reasons, in conclusion of the second issue, the Arbitrator found that "the Company did not have just cause to discharge the Grievant." (*Id.*)

5

Finally, because the Grievant was terminated without just cause, the Arbitrator resolved the final issue by ordering the Company to reinstate the Grievant, pay him lost income, and expunge all records of his discharge—including the positive test result. (*Id.*)

### C. This Case

On January 1, 2018, the Company filed the instant lawsuit, asking the Court to vacate the Arbitrator's award. (Doc. 1 at 1). Plaintiff's Complaint alleges three causes of action as to why the award should be vacated: (1) the Arbitrator exceeded the scope of his authority; (2) the Arbitrator did not arguably interpret the CBA; and (3) enforcing the award would violate public policy.[3] (*Id.* at ¶¶ 63–95).

Now, the parties have submitted cross motions for summary judgment on each of the three claims set forth in the Complaint. (Docs. 12, 13). The cross motions have been fully briefed and are ripe for adjudication. (Docs. 14, 15, 16, 17). This Order follows.

## II. STANDARD OF REVIEW

### A. Summary Judgment

A motion for summary judgment should be granted if the evidence submitted to the Court demonstrates that there is no genuine dispute as to any material fact, and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). The moving party has the burden of showing the absence of genuine disputes over facts which, under the substantive law governing the issue, might

---

[3] The Court sets forth the causes of action alleged in the Complaint in the order they are addressed in the parties' briefing. (*See* Docs. 12, 13, 14, 15, 16, 17).

6

affect the outcome of the action. *Celotex*, 477 U.S. at 323. All facts and inferences must be construed in a light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

A party opposing a motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248.

### B. Arbitration Review

When reviewing an arbitrator's construction of a collective bargaining agreement, courts apply "one of the narrowest standards of judicial review in all of American jurisprudence." *Lattimer-Stevens Co. v. United Steelworkers of Am., AFL-CIO, Dist. 27, Sub-Dist. 5*, 913 F.2d 1166, 1169 (6th Cir. 1990). This is because, when parties agree to arbitrate disputes under a collective bargaining agreement, the parties bargain for the interpretation of the arbitrator, not the federal court. *Econ. Linen & Towel Serv., Inc. v. Int'l Bhd. of Teamsters, Teamsters Loc. Union 637*, 917 F.3d 512, 513 (6th Cir. 2019).

In reviewing an arbitration award, the Court asks three questions of "procedural aberration":

> Did the arbitrator act "outside his authority" by resolving a dispute not committed to arbitration? Did the arbitrator commit fraud, have a conflict of interest or otherwise act dishonestly in issuing the award? And in resolving any legal or factual disputes in the case, was the arbitrator "arguably construing or applying the contract"?

*Mich. Fam. Res., Inc. v. Serv. Emp. Int'l Union Loc. 517M*, 475 F.3d 746, 753 (6th Cir. 2007). In addition, the Court must "refrain from enforcing" an arbitration award "if the

contract as interpreted by [the arbitrator] violates some explicit public policy." *W.R. Grace & Co. v. Local Union 759*, 461 U.S. 757, 766 (1983).

### III.  ANALYSIS

Here, there is no allegation that the Arbitrator committed fraud, had a conflict of interest, or otherwise acted dishonestly. Instead, the Complaint alleges that it is appropriate to vacate the award, because: (1) the Arbitrator exceeded his scope of authority; (2) the Arbitrator did not arguably interpret the CBA; and (3) enforcement of the award would violate public policy. (Doc. 1 at ¶¶ 63–95). As set forth *infra,* the Court does not find any of these claims meritorious. As such, the Arbitrator's decision must be upheld on the undisputed facts and as a matter of law.

**A.     The Arbitrator acted within the scope of his authority.**

The Sixth Circuit has confirmed that "[a]n arbitrator does not exceed his authority every time he makes an interpretive error; he exceeds that authority only when the collective bargaining agreement does not commit the dispute to arbitration." *Equitable Res., Inc. v. United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union, AFL-CIO/CLC*, 621 F.3d 538, 545 (6th Cir. 2010) (quoting *Mich. Family Res.*, 475 F.3d at 756).

"This approach severely curtail[s] the scope of authority concept such that an award should not be vacated unless an arbitrator reaches a question **not committed to him by the parties.**" *Id.* (quoting *Totes Isotoner Corp. v. Int'l Chem. Workers Union Council/UFCW Loc. 664C*, 532 F.3d 405, 414 (6th Cir. 2008)) (emphasis added, internal

8

quotation marks omitted)); *see also Truck Drivers Local No. 164 v. Allied Waste Sys.*, 512 F.3d 211, 217 (6th Cir. 2008).

Here, the Arbitrator plainly acted within the scope of his authority. The CBA requires the parties to resolve any disputes regarding the application of the CBA through binding arbitration. (Doc. 10-1 at 274–77). In accordance with the CBA's provisions, the parties selected the Arbitrator to hear the grievance now at issue in this Order. (Doc. 10-3 at 3). Then, the parties **agreed** that the Arbitrator would resolve three issues: (1) did Article 25 give the Company the right to drug test the Grievant?; (2) was the Grievant discharged from the Company for "just cause"?; and (3) if the Company did not have just cause, what was the remedy? (*Id.* at 3–4). In his decision, the Arbitrator addressed each of these issues committed to him—nothing more. (*Id.* at 10–14). Thus, the Arbitrator plainly acted within the scope of his authority when resolving the grievance.

Notably, each of the Company's arguments in opposition to this conclusion focuses on whether the arbitrator made interpretive errors, rather than whether the dispute was actually committed to the Arbitrator. (Doc. 12 at 13–14). As numerous courts have recognized, arguments such as these do not provide a basis to conclude that the arbitrator exceeded the scope of authority. *See, e.g., Truck Drivers*, 512 F.3d at 217; *Americold Logistics, LLC v. Loc. 17A United Food & Com. Workers, AFL-CIO*, No. 5:12-CV-749, 2013 WL 351159, at *3 (N.D. Ohio Jan. 29, 2013).

Based upon the foregoing, the Court concludes that, on the undisputed material facts and as a matter of law, the Arbitrator acted within the scope of his authority when

resolving the grievance. Thus, the Company's first claim in support of vacating the award is unavailing.

### B. The Arbitrator arguably interpreted the CBA.

The "arguably interpreted" test "focuses on a single question: did the arbitrator appear[] to be engaged in interpreting the agreement or agreements before him? If so, the court's inquiry ends." *Bhd. of Locomotive Engineers & Trainmen v. United Transp. Union*, 700 F.3d 891, 901 (6th Cir. 2012) (quotation marks and citations omitted). To determine whether arguable interpretation has occurred, courts consider whether the arbitrator's decision contains the "hallmarks" of contract interpretation. *Id.* That is, courts ask whether the arbitrator's decision "refers to, quotes from[,] and analyzes the pertinent provisions of the agreement." *Id.* (citation omitted).

Importantly, the arguably interpreted analysis is <u>not</u> concerned with "whether the arbitrator interpreted the [agreement] correctly." *Teamsters*, 917 F.3d at 513. "Whether [the Court] agree[s] with the arbitrator's reasoning, [or not] . . . is beside the point." *Royal Ice Cream Co. v. Teamsters Loc. No. 336*, 506 F. App'x 455, 458 (6th Cir. 2012). What matters is that the Arbitrator plausibly sought to interpret the provisions of the agreement, rather than implement his own "brand of industrial justice." *Truck Drivers*, 512 F.3d at 217 (citation omitted).

Here, the Arbitrator's decision easily meets the arguably interpreted standard. As an initial matter, the Arbitrator's decision bears all the hallmarks of contract interpretation. The Arbitrator specifically referred to and quotes from the contract at issue: the CBA. (Doc. 10-3 at 4–5). The Arbitrator then analyzed and interpreted the

10

plain meaning of the CBA's relevant provisions. (*Id.* at 10–14). And thereafter, the Arbitrator unequivocally applied his reading of the CBA's terms to the inquiries submitted by the parties. (*Id.*) These hallmarks show that the Arbitrator's award was firmly based in the CBA's provisions.

Moreover, the Arbitrator's ultimate conclusion was also grounded in the CBA. Reading the CBA's just cause and drug testing provisions together, the Arbitrator found that the Company had not acted arbitrarily in subjecting the Grievant to a test which it believed was appropriate at the time. (*Id.* at 10–13). But, the Arbitrator determined that, as the Company had not afforded the Grievant any sort of industrial due process pre-discharge, the Company had terminated him without "just cause." (*Id.* at 13–14). On this reading, the Arbitrator concluded that the Grievant must be reinstated with lost wages and an expunged record. (*Id.* at 14).

Notwithstanding the Arbitrator's careful analysis, the Company argues that the Arbitrator's interpretation of the CBA was wrong, because the Arbitrator failed to consider Article 25's termination provision: "a confirmed positive test will result in discharge." (Doc. 17 at 6–7). The Company claims that, based on the unequivocal record presented, the Grievant tested positive for Marijuana use. (*Id.* at 6). And the Company assets that, given the termination provision's mandatory language, the Arbitrator should have found the Grievant's discharge was required. (*Id.*) The Company's argument misses the mark, for at least three reasons.

As an initial matter, the Court is not convinced that the Company's reading of the CBA is plausible. By asking the Court to focus solely on Article 25's discharge

11

language, what the Company is really asking the Court to do is read that discharge language out of context. But there is no indication that Article 25 was meant to be interpreted in isolation from the rest of the CBA. (Doc. 10-1 at 295). For example, Article 25 does not say that termination shall result regardless of any just cause determination; nor does Article 25 say that termination shall result absent any investigation. (*Id.*)

Moreover, the Arbitrator fully considered Article 25's termination provision. The Arbitrator did not ignore the fact that Article 25 allows the Company to discharge an employee after a positive drug test. (*See* Doc. 10-3 at 13–14). Rather, the Arbitrator found that a positive drug test did not relieve the Company of its obligation to support a termination with just cause. (*See id.*) (By, *e.g.*, investigating the termination, considering whether the test was duly administered, etc.). (*See id.*). Had the Company fully considered the circumstances surrounding the Grievant's test, the Arbitrator's award may well have been different.

Finally, the Court would note that, as the Court has concluded that the Arbitrator arguably interpreted the CBA—*i.e.*, that the Arbitrator applied the CBA and did not disregard its terms—the Court's analysis is at an end. Even if the Court had any disagreements with or reservations about the Arbitrator's analysis (which it does not), "[w]hether [the Court] agree[s] with the arbitrator's reasoning, [or not] . . . is beside the

12

point." *Royal*, 506 F. App'x at 458. Here, the Arbitrator's analysis is grounded in the CBA's text. Thus, arguable interpretation unequivocally exists.[4]

All things considered, the Court concludes that, on the undisputed material facts and as a matter of law, the Arbitrator arguably interpreted the language of the CBA when reaching his decision. Thus, the Company's second claim in support of vacating the award is unavailing.

### C. The Arbitration decision does not violate public policy.

The Court must "refrain from enforcing" an arbitration award "if the contract as interpreted by [the arbitrator] violates some explicit public policy." *W.R. Grace & Co.*, 461 U.S. at 766. "[W]hen an arbitration award is challenged on public policy grounds, the court must determine whether the arbitrator's [decision] . . . jeopardizes a well-defined and dominant public policy . . . ." *Bd. of Cty. Comm'rs of Lawrence Cty., Ohio v. L. Robert Kimball & Assocs.*, 860 F.2d 683, 686 (6th Cir. 1988). The public policy must "be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests." *Id.* (quotation marks and citation omitted).

---

[4] The Company also asserts that the award "is the Arbitrator's own brand of justice." (Doc. 12 at 3–4). In support of this proposition, the Company asks this Court to follow *Georgia-Pac. Gypsum, LLC v. Int'l Bhd. of Teamsters Loc. 117*, No. X:11-CV-5497, 2011 WL 5438981 (W.D. Wash. Nov. 8, 2011). However, *Georgia-Pac* is readily distinguishable from this case. In *Georgia-Pac*, an employee submitted to a <u>random</u> drug test pursuant to the CBA's drug testing policy, and was terminated after a positive result. *Id*. at *1. Although there was no "just cause" provision in the CBA, the arbitrator read "just cause" into the policy, and determined that one positive drug test over 25-years of unblemished service was not "just cause." *Id*. The Western District of Washington vacated the award because the clear and unambiguous language of the CBA read that: "[a]ll positive test results will result in termination." *Id*. *3. Moreover, there was no other provision of the CBA lending a plausible explanation to the arbitrator reading "just cause" into the policy when it did not exist. *Id*. That is simply not the case here—random testing is a violation of the CBA <u>and</u> the CBA mandates discharge for just cause.

Importantly, when considering whether an arbitration decision should be vacated on public policy grounds, the key "issue is not whether the grievant's conduct violates public policy, but whether enforcement of [the arbitrator's decision] would be contrary to public policy." *Columbia Gas of Ohio, Inc. v. Util. Workers Union of Am.*, 329 F. App'x 1, 4 (6th Cir. 2009) (emphasis in original). Thus, whereas here, an arbitration decision directs an employer to reinstate an employee, the key question at issue is whether the employee's reinstatement would violate public policy. *Way Bakery v. Truck Drivers Loc. No. 164*, 363 F.3d 590, 595 (6th Cir. 2004)

Here, the Company correctly notes that there is a "broad [public] policy against permitting individuals [to work] in safety-sensitive positions while under the influence of drugs [such as Marijuana] . . . ." (Doc. 12 at 15); *see Kennecott Utah Copper Corp. v. Becker*, 195 F.3d 1201, 1205 (10th Cir. 1999) (confirming that "[s]everal courts have held that a clear public policy exists against performing safety sensitive jobs while impaired by drugs or alcohol" (collecting cases)); *see also Skinner v. Railway Labor Executives Ass'n*, 489 U.S. 602, 621 (1989) (confirming that there is a strong interest in preventing employees "from using alcohol or drugs while on duty" to ensure the safety of the public and the employees).

However, the Court cannot conclude—as the Company asks it to conclude—that the Grievant's reinstatement would violate this "broad public policy." In this case, there is no question that the Grievant worked in a safety-sensitive position. (Doc. 10-3 at 1). Nor is there any question that the Grievant tested positive for Marijuana. (*Id.* at 2). However, there is simply no evidence on the record before the Court that the Grievant has

14

ever worked under the influence of Marijuana. (*See id.* at 14). Nor is there any indication that the Grievant is at risk of doing so in the future. (*See id.*).

On such a record, any concern that the Grievant will work while impaired, moving forward, is based on nothing more than speculation. And the speculation that an arbitration award will result in a violation of public policy is not a sufficient reason to vacate the arbitration award. *Cf. United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc.*, 484 U.S. 29, 44 (1987) (stating that it was not appropriate to infer that a grievant had used marijuana at work, or to conclude that the grievant's reinstatement would violate public policy, from the fact that Marijuana was found in is car).

The Company also contends that the arbitration award is contrary to public policy because "state and federal law allow employers to implement drug and alcohol policies … [and] permit employers to enforce these policies." (Doc. 12 at 16). [5] However, this general formulation of public policy would not be violated by reinstating the Grievant, particularly given the fact that the Arbitrator arguably interpreted a valid CBA. "[A] formulation of public policy based only on 'general considerations of supposed public interests' is not the sort that permits a court to set aside an arbitration award that was entered in accordance with a valid collective-bargaining agreement." *Misco*, 484 U.S. at

---

[5] The Company cites no statute or regulation in support of this argument, instead citing three cases discussing arbitration awards and drug policies – none of which this Court finds persuasive. (Doc. 12 at 16). In all three cases, the courts <u>declined</u> to consider or did not discuss public policy arguments. Rather, the courts in those cases analyzed the CBAs at issue and the arbitrator awards, as the Court did here. *Gulf Coast Indus. Workers v. Exxon Chem. Ams.*, 863 F. Supp. 423, 429 (S.D. Tex. 1994) (declined to consider public policy arguments); *Voss Steel Employees Union v. Voss Steel Corp.*, 797 F. Supp. 585, 591 n.3 (E.D. Mich. 1992) (declined to consider); *Mountaineer Gas Co. v. Oil, Chem. & Atomic Workers Int'l Union*, 76 F.3d 606 (4th Cir. 1996) (did not discuss public policy).

44 (citing *W.R. Grace*, 461 U.S. at 766). Thus, given the very speculative and general public policies cited by the Company, this case is not an <u>exceedingly narrow</u> situation in which a court may vacate an arbitration award based on well-defined, explicit public policy. The Company's third claim in support of vacating the award is unavailing.

### IV. CONCLUSION

Based upon the foregoing, the Company's cross motion for summary judgment (Doc. 12) is **DENIED** in its entirety and the Union's cross-motion for summary judgment (Doc. 13) is **GRANTED** in its entirety. The Court hereby **CONFIRMS** that the Arbitrator's award (Doc. 10-3) is enforceable in its entirety. The Clerk shall enter judgment accordingly, whereupon this civil action is **TERMINATED** upon the docket of this Court.

**IT IS SO ORDERED.**

Date:  5/17/2021                                                                 *s/Timothy S. Black*
                                                                                              Timothy S. Black
                                                                                              United States District Judge